Ms. Bindler, would you please announce our third and final case for argument? Third case called for argument this morning is United States v. Todd Sutton, Jr. That was quick. You made it. I understand you had an argument this morning. I did. Downtown. No traffic, so that was good. Perfect. May it please the court. This case presents the question Florence explicitly left open. Whether a jail may automatically strip search pre-arraignment detainees not yet committed to the general population. Mr. Sutton is asking this court to reject that that is consistent with the Fourth Amendment. Because Cerro Gordo County searched Mr. Sutton before deciding any housing assignment and without showing... Didn't they know he was going to be held for a short period of time with other people? They did. Is that enough? No. Why not? It's not enough for an automatic search. Because Florence was so clear in that distinction between general population and whether there are going to be other options. And Justice Alito's opinion specifically noted, I'm not going that far. I don't think the court needs to go that far. And then when discussing other options, noted that BOP, when they bring people in and some county jails can house people separately from general population. Because the focus and the concern is due to the nature of general population. You're having a lot more inmates. They're there for a longer period of time. You have concerns of rival gangs, more concerns with the infectious diseases being spread in the general population. So it's just different than the intake situation. There's at least two others, right, going to be affected by him. Is that the record here? The record is that he was put in with two others. But the record also is that there was two dorms which housed multiple people. And they also had four individual cells. When asked during this pressure hearing, was anyone else in these individual cells? The officer stated, I don't know. So we don't have on this record an indication that it was impossible to house Mr. Sutton alone away from other people. So there was absolutely no contact with others while he's in this intake process. And we'd asked this court to follow the 10th Circus decision in Hinkle. And there the court said, we're not going to sanction pre general population strip searches of everyone. And they did so noting based off of the guideposts from the Florence decision. And crucial in Florence was that there was no other alternative. These individuals were going to the general population. Back to the number of people we know he was with, too. Doesn't the record also reflect there could have been as many as 10 in that dorm? So I think that it held as many as 10. So it's hypothetically possible that there are other people who are going to be around. The question is whether a hypothetical possibility of being around other people for a short period of time justifies the very degrading and intrusive strip search. And part of I keep calling it a strip search, and I think that's a bit inaccurate. Because really this is like the strip search in Hinkle. Because it's not just a. Go ahead, finish your sentence. It's not just a disrobing. Both the policy in Hinkle and the policy here allowed for. Hinkle has a critical thing. I'm going to interrupt this time. Hinkle has the critical fact they knew he wasn't ever going in the jail general population. Former officer, right? Well, that's that's different. If you know from the very beginning, it's just him alone somewhere, right? It's different factually, but I don't think it supports that this court should adopt a rule that no matter what you can strip search someone before deciding they're going to the general population. And I think it's especially true. That's really what the what the what the ruling was below. The ruling was below that they were going into a population that had multiple people in it and that there were safety concerns, right? That's that's the idea. It relied on Judge Bennett's old opinion, you know, and and really the argument is, is that's pretty akin to a general population is that you are putting a person into a mixed group of people. You don't really know who they are because it's pretrial and there could be any kind of thing going down in that place and that that it's prudent to and reasonable and and to conduct that type of a search. And you're arguing that that that's not true because there's a difference somehow between whatever general population is and this group of people we just arrested in the last four hours. And and what is that distinction? And why is it compelling a different conclusion? We are. That is the position that it is a distinction. You don't have the big groups of people like you do have in general population, a smaller number.  You don't have concerns with that bigger group, maybe rival gangs, situations like that. We also know it's not a concern and not similar to the general population based off of the county's own policy, because there is an exception for individuals who are arrested for simple misdemeanors or below. If the concern is even an intake, anybody could be bringing in contraband or something like that. It could be a danger to other inmates or to the officers, then they should be searching everyone. And that's what Florence said, because I think that's what the petitioners were arguing in Florence. Well, separated out by offense, maybe only strip search certain people. And the court said that doesn't make sense because even individuals who are charged with minor offenses can be bringing in contraband for a lot of reasons. So we know it's not necessary in this intake process because the county has determined that it's not necessary in every instance. So I struggled a bit with this case because it's unusual in that generally, these strip search cases are coming from the civil context. And you're having a lot of evidence about general jail policies or what's generally happening. And in this case, it was a discussion of the policy. But the evidence we have is simply the facts of Mr. Sutton's case. And I think when you look to that, our position is that you can't automatically strip search somebody without individualized need. And looking at the facts that have been presented here, those factors aren't established. One being the policy itself that says not everybody needs to be strip searched, even if they're going to be put in these dorms. There's also officer testimony that it happens that people who are not strip searched are placed with other people. They're not separated. The officers couldn't even tell or indicate if that if Mr. Sutton could be could be placed separately and away from other people. There was evidence that he had sufficient money to bond out. In fact, the officer indicated you go before them. Boy, I thought the as you know, this is a substantial evidence test by the Supreme Court's statement. I thought the real evidence on that was he's definitely going to be there for a while once he heard the price of the bond. Mr. Sutton. Yeah, I would disagree with that. I thought that was clear from the facts, the substantial evidence. I would disagree. But I think what it was is there was it wasn't clear. I would say he had the money to bond out using a bondsman. They didn't know if he tried to call a bondsman. I think there was evidence that he was calling someone. But more importantly, I think there was evidence that he was going to meet a magistrate at 10 a.m. And the officer indicated you might not even have to worry. You don't even worry about bonding out because the judge just might let you. That's when he gave up on the bond is after that comment. Right. That's the that's the record here. So he's definitely going to be there. How many hours? So he was brought to the jail, I believe, at three fifty a.m. So then it would be about six hours, which is not as good. Yeah. Which is not a significant period of time, at least significant to justify the level of intrusion. That is these strip searches. It's just insufficient to. It's your argument that the jail policy, which fails to. To segregate people who are serious misdemeanors and above, who are supposedly a threat. And we're concerned about research from the other regular misdemeanors who that we don't search, that the failure to segregate those two groups from each other is fatal to this policy because it shows the policy is, in fact, unnecessary. Yes, that it's not about danger. It's not necessary for protection under the Fourth Amendment. So there are no immediate questions. I would reserve the remainder of my time. Good morning. May it please the court. My name is Patrick Greenwood. I represent the United States. I'm out of the northern district of Iowa. The jail policy at issue here and as applied to the defendant does create reasonable steps to achieve the penological interest of those administered who are charged with administering and have the practicalities of looking out for and housing inmates on pretrial as well as creating a balancing, a proper balancing of the privacy interest of those inmates and those who are to be searched. One item that has not been brought up first is the standard, which is before the court. It is very clear the government contends from the Supreme Court in Turner Bell and in Florence that deference in this case and in looking at jail policies should be given to those who administer and create those jail policies who are charged and who do have those penological interests. So at the beginning, the standard is that deference should be given to those who create the jail policies. You know, the unless clause that Justice Thomas adds, right? You're familiar with it. It's in the district court's order. I apologize. Yes, because I'll read it unless the record contains substantial evidence showing their policies are unnecessary or unjustified response to the problems of jail security. Yes, sir. Exactly. And that because Justice Alito's opinions controlling. Yes, sir. And the government would contend that the record actually provides that full that there is full justification for the current issue in the current policy. There is nothing in the record, let alone substantial evidence, which create that this is an unnecessary response. First in one item that the government would like to highlight is first as part of the segregation of those charged with who are arrested, brought in and are charged with a simple misdemeanor or below. It is in the policy that when available, and this is a government's exhibit three B during the suppression hearing, when available, when possible, those charged with simple misdemeanors or below are to be segregated. The position before the court was in response to a jailer who was asked on cross examination. Are there times and I believe this is at page twenty five. Are there times when a individual charged with simple misdemeanor or below could be housed with others who are charged with higher offenses and that which the correctional officer responded with? Yes, that really gets to the heart of the issue here, too. And the position and the proposition by the defendant is speculation is looking ahead is the what ifs. The current policy creates a clear line for those jail administrators on what to implement, when to search and how to search additional item that the government would like to highlight. And I know it was an issue in the Florence court for the dissent is is a pat down and the government would like to highlight it was not in either party's briefs, clarifying that in this case and as part of the policies, the arresting officer first with Mr. Sutton did take part, did conduct a pat down, did not find any illicit items on the defendant. He was then brought to the jail, was gone through and taken through his booking process. Then as part of the jail policy, he was then brought in before the visual search or strip search was conducted. And this is at page 50 of the trial of the suppression transcript. Let me ask you. Let me ask you this, Mr. Greenwood. You keep talking about the policy. Do we need to opine on every aspect of the policy? Isn't the question before us whether this particular search is reasonable? Correct, sir. And in this but this search was conducted in line with the policy and what the Cerro Gordo County Jail and Sheriff's Office is attempting to do is create a reasonable policy. It is clear where wait and see is not appropriate, which makes it easy taking into account the privacy interests of those to be searched. We need to opine whether not applying it to misdemeanors makes a difference. It's simply in a response to the concerns of the jail of whether or not those I believe it's like four items, roughly contraband gang affiliation diseases, whether or not that is an item that they properly took into account. And again, deference being given to the jail policy and those who created is important. And so in this case, again, as was a concern by the dissent in Florence, there was a pat down that was conducted arrest. There was a pat down that was conducted prior to the visual inspection and a strip search. At what time no contraband was discovered. It was only through this strip search or visual search where the contraband was found. Additional item that the government would like to note is this idea that it's certainly that it matters on the number of people for what is general population versus what is the case before this court here. I got covid and I was hunting with one other person. I'm not familiar with where disease matters to a larger number of people, whether a stabbing is more likely, I guess, if there's going to be more people, whether or not if contraband is introduced more people where that where that matters. The analysis and the justification in Florence for allowing it when it was clear that it was analysis under the general population certainly applies to this case here. The correctional officers knew at the time that he was going to be housed with at least two other individuals. The defense is correct that it is unclear from the record whether or not there were even options. The government would contend that is more, I guess, favorable to the government's position that it's not clear that there were even other options available to no findings of fact about that. And the magistrates reported the district court. Yes, I correct. Exactly. And one additional or final item that the government would would like to highlight is this discussion on how long he would be housed. What was the position? It is clear from the snippet of the body camera footage at arrest that the defendant did possess enough money potentially if he contacted a bondsman. Again, it is unclear whether or not he contacted a bondsman. The report and recommendation stated that it was a bit difficult to hear, but the report and recommendation stated that it almost appeared as if he did not want to go through a bondsman. Therefore, it was at least conceivable that for at least this next seven, possibly eight hours, I believe what was specifically said at the time to the defendant was you will be seen. You will see a judge before noon. It's my understanding from the record that there isn't a clear time of when a defendant or excuse me, inmates are put before a magistrate for their initial appearance. So at the time, what was said to the defendant was you will see a judge before noon recognizing the suppression transcript does say around ten o'clock. So the government would contend roughly seven to eight hours with contact of other individuals and deference given to the policy of the magistrate. You know, the defense has argued that that the distinction is not searching misdemeanors versus serious misdemeanors is is is a crucial question as to the reasonableness of this policy and to the reasonable search ultimately. And, you know, you couldn't make a better factual case for this with the from a law school exam question because you got a guy who's sitting here who is driving while barred. Right. And so he's got the two to six year suspension because he's a habitual not follow the rules of the road guy. And then you also have the regular driving under suspension guys who just don't do what they're supposed to do and don't show up. Now, they're kind of the same person, but for one has become perceived to be more incorrigible because they've never gotten around to doing any things they're supposed to do. And so it's a really kind of minimal difference between these two groups. But we know the driving under suspension guy never gets searched. But the driving while barred guy is always getting searched. And does that matter in any way in your worldview? Your Honor, if anything, the the policy is trying to further, I believe, restrict and create a reasonable balance. And so an individual who is looking at, in this case, two years, it is it's an aggravated misdemeanor or greater. That is important. Additionally, as a factual basis for this case is that just six months prior at this jail, this defendant also had concealed. Well, yeah, he's a repeat offender on exactly the same conduct. That's bad. Yes, Your Honor. With that, the government would submit. Thank you. Thank you, counsel. Miss quick rebuttal. So I recognize Florence and the standard is deference to the policy in the jail, unless there's substantial evidence. We would argue there's substantial evidence based off of the policy itself that this was unnecessary. But what I struggle with is we're in a criminal case. And generally, when we have a motion to suppress at the district court, it's the government's proved burden to prove that it's a lawful search. So I struggle with it. And I understand that that's the standard from Florence. And we're dealing with that. We're dealing with the civil cases, but it seems this is a little unique because we're dealing with a criminal case. As far as the fact that Mr. Sutton had been brought in for had been found with contraband six months prior as he was being arrested. I would note that the magistrate court found that our position, it has to be probable cause if that's going to be a basis to search. And the magistrate court found that it would not even be reasonable suspicion because and that's in line with this court's reasonable suspicion cases, especially in the Terry stop context. You can't say, I see Mr. Smith. I know he had a gun six months ago, so I can stop him and see if he has a gun. There has to be within that time evidence to show that the individual is possessing a firearm. So the same applies to Mr. Sutton. Yes, he had brought in contraband six months prior. But you have to look at the circumstances from when he was arrested in this moment before he smelled like marijuana. In this instance, there was no testimony spelled like marijuana or there was any evidence that it appeared he was he had contraband on him even after the pat down search. And finally, to, if I may, this idea that it's like general population, if you're even with another person that reads the exception just out of existence. If it is any time you're in the Hinkle case, go ahead. Right. Council. It would not in the Hinkle case where they always knew he was going by himself someplace. Correct. Correct. So Hinkle still stands. Go ahead. But if this court says substantial contact, which was only a for justice opinion, if it's any other person, then we don't concur. It's not really a for justice opinion, right? We look at Justice Salido's opinions. So the substantial contact section that I'm talking about, Justice Thomas declined to decline to join that part. So it is only for justice. One other question. The prior prior incident, does the record reflect whether those conducting the search were aware of that? So it does. They were aware. And I think it one of the officers, as he was brought into that intake process was like, oh, I know this guy from six months prior and then told the individuals who were handling it. Yeah. But if there are no further questions, it has to reverse the denial of the motion to suppress. Thank you. Hearing none. Thank you. Council court appreciates both of your appearance and argument and especially as quickly rushing from downtown. It's a good thing you don't commit any serious misdemeanors. You have the right to remain silent. Anything you say. Ms. Bindler, does that complete our docket for the day? Yes. Very well. The court will be in recess at least officially until nine a.m. tomorrow morning. Unofficially, I think we're going to have a little program here. We'll be in recess.